O

JS - 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.    EDCV 06-00568-SGL (OPx)                                                      Date:  October 4, 2009

Title:    JOSE ANTONIO FIERRO AVALOS; SANDRA FIERRO SALAMANCA -v- CITY OF COLTON, COLTON POLICE DEPARTMENT, CHIEF OF POLICE KENNETH RULON, POLICE OFFICERS, MOOREHOUSE, McFARLAND, JOLLIFF and Does 1 to 10

==================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

           Cindy Sasse                                               None Present
           Courtroom Deputy                                          Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:           ATTORNEYS PRESENT FOR DEFENDANTS:

None present                                                      None present

PROCEEDINGS:   **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
                             (DOCKET #69)

     This case arises from defendants' search of plaintiffs' family home at 7:00 a.m. on April 30, 2005, pursuant to a search warrant obtained by City of Colton police officer James Jolliff.  As a result of that search, plaintiff Jose Fierro Avalos was arrested and later tried for various drug offenses.  Although there are other constitutional violations that are alleged to have occurred in connection with the search of the home and arrest of Mr. Avalos, the one being contested by the parties at this point concerns the question of whether there was probable cause for the issuance of the warrant and the related question of whether material facts were omitted by Officer Jolliff from the warrant application.  It is to the facts (none of which are disputed by either party) concerning that particular issue that the Court now turns.

I. UNDISPUTED FACTS

     Officer Jolliff, who has over seventeen years of law enforcement experience much of it tied to investigating narcotics crimes, was the affiant who, on April 30, 2005, drafted the facts contained in an Affidavit submitted in support of the issuance of a search warrant and the Search Warrant

itself (collectively "the warrant"). What led Officer Jolliff to submit the application to search plaintiffs' home is relayed below.

### *Circumstances Leading to Application for a Warrant to Search Plaintiffs' Home*

Officer Jolliff was assigned as an investigator for the Narcotics Unit of the Colton police department during which time he specialized in investigating and assisting in prosecutions of narcotics related crimes. Beginning in 1997 and continuing for approximately 2.5 years, and before he drafted the facts supporting probable cause for the warrant at issue, Officer Jolliff had been assigned (with the title of "case agent") to a joint task force between local law enforcement agencies and the DEA. In that capacity he controlled local narcotics investigations by delegating investigative assignments, debriefing narcotics officers, conducting electronic surveillance, developing operational plans, managing and paying narcotics informants, and presenting narcotics cases to the United States Attorney's Office and the San Bernardino County District Attorney's Office.

For a period of several years, Avalos worked under contract as a paid informant for the same DEA task force to which Officer Jolliff was assigned. Indeed, Officer Jolliff was first introduced to Avalos while Officer Jolliff worked that assignment, and he does not recall meeting, or having knowledge of Avalos before that assignment. Officer Jolliff, however, did not manage or control Avalos in his capacity as an informant, or in any other capacity, but simply briefly came in contact with him (meeting Avalos on two or three occasions) during his time working on the joint task force. On one of those occasions, Officer Jolliff was present at the Four Season apartment complex when Avalos was meeting his DEA handlers during a DEA narcotics investigation.

Dating back to the early 1990s, the Four Seasons apartment complex in Colton was known to Officer Jolliff as a particularly problematic location with respect to gang and violent crime related activity.

When Officer Jolliff's joint task force assignment with the DEA ended in 2000, he was reassigned to patrol in Colton. If, upon that reassignment, Avalos remained as an informant, Officer Jolliff believed that he also worked as the manager of the Four Seasons apartment complex. Officer Jolliff's patrol duties included responding to service calls at the apartment complex, and Avalos occasionally provided Officer Jolliff with useful information related to those calls. In approximately the first year after returning to patrol, Officer Jolliff heard several times, from different sources, that Avalos was dealing narcotics at the Four Seasons.

In 2002, Officer Jolliff spoke with Avalos about the information he received that Avalos was selling methamphetamine at the Four Seasons. Officer Jolliff told Avalos that if the information was true, Avalos needed to stop that activity. In response, and without elaboration, Avalos said "okay."

In October 2004, Officer Jolliff was assigned to desk duty as a narcotics detective because of an injury he had suffered. In November, 2004, Sgt. Steven Glass told Officer Jolliff that he

interviewed a confidential informant ("CI#1") who told Sgt. Glass that Avalos was selling methamphetamine out of the Four Seasons, and that he/she had purchased from ⅛ to ¼ of an ounce of methamphetamine from Avalos on at least 15 occasions in the 60 days immediately preceding the November, 2004, interview.  Sgt. Glass told Officer Jolliff that CI#1 said, in order to effect the purchase, he/she would call Avalos on his (Avalos's) cell phone, and Avalos would drive to the Four Seasons and sell the methamphetamine there.

In January, 2005, Officer Jolliff went back into the field in the same capacity as he did before as a narcotics detective.  Near that time, Officer Jolliff learned that there was a DEA investigation into narcotics dealing at the Four Seasons generally, and that Avalos had also become a target of the investigation.  The DEA team conducting that investigation was unrelated to the one Officer Jolliff had worked with previously.  The Colton police department, under the supervision of Sgt. Glass, provided support to the DEA.  Officer Joliff was told that the DEA surveillance of Avalos had been compromised by counter-surveillance undertaken by Avalos and also because Avalos appeared to recognize one of the DEA agents.  The DEA investigation then ended.[1]

Around the same time, the Colton police department narcotics team began their own investigation of Avalos as a suspect believed to be supplying narcotics in Colton.  Officer Jolliff heard from several sources that Avalos was dealing methamphetamine, but the information was insufficient for inclusion in the warrant.  Officer Jolliff also learned that Avalos had moved from the Four Seasons (even though he remained as manager of the apartment complex) to a private residence located on North Virginia Drive in Colton.  At that time, Officer Jolliff was unsure whether Avalos was working as a DEA informant, but, even assuming he was, Officer Jolliff knew that it was inappropriate under informant handling rules for Avalos to be selling drugs in Colton.

Within forty-five days before the search warrant application was drafted, approved, and executed, Officer Jolliff spoke in person to another confidential informant ("CI#2"), who told him that he/she had either purchased, or been given to sell, up to 2 ounces of methamphetamine on three occasions by Avalos.  CI#2 also told Officer Jolliff that Avalos was the manager of the Four Seasons apartment complex and that Avalos lived at a residence on Virginia Drive.  CI#2 also told Officer Jolliff that, in order to effect the purchase, he/she would call Avalos, and Avalos would respond from his residence to the Four Seasons and sell the methamphetamine to CI#2 there.  CI#2 finally told Officer Jolliff that Avalos was sophisticated, and used counter-surveillance by calling people who work with him to look out for police officers at the Four Seasons before he arrives to sell the methamphetamine.  This fit into what Officer Jolliff was told by the DEA agents who stopped their surveillance of Avalos because of his recognition of one of their agents.  CI#2 also told Officer Jolliff that Avalos is a major supplier of methamphetamine in the eastern part of

---

[1] Although Avalos disputes that he was actually selling methamphetamine at the time (or at any time) the DEA investigation was underway, he has <u>not</u> disputed the fact that the DEA had started an investigation of the methamphetamine activity at the apartment complex and that he was a target of that DEA investigation.

Colton, and gives methamphetamine to tenants at the Four Seasons to sell on his behalf.

On the morning of the warrant application, approval, and execution, Officer Jolliff spoke in person to another confidential informant ("CI#3"), who told Officer Jolliff that he/she had purchased a small amount of methamphetamine from Avalos within the preceding ten days. CI#3 also told Officer Jolliff that he/she had purchased small amounts of methamphetamine in excess of 20 times from Avalos's residence at 1732 North Virginia Drive in Colton. CI#3 further stated that he/she had been present when Avalos sold methamphetamine to other buyers from the garage of his residence. In order to corroborate what CI#3 had said about Avalos selling methamphetamine from his house, Sgt. Glass and another Colton police officer, Eric Campa, drove with CI#3 to see if he/she could point out Avalos's residence. CI#3 directed the officers to North Virginia Drive and pointed out the residence having address number 1732, a fact which was then relayed to Officer Jolliff.

Thereafter, Officer Jolliff used police department databases to verify that Avalos had a valid California listing his residence as 1732 Virginia Drive in Colton as of October of 2004. Officer Jolliff also found out that Avalos had arrests for possession of a controlled substance, sale of cocaine base, transport/sale of controlled substance, and sales in lieu of controlled substance for the years 1978, 1985, 1991, and 1994. In 2003, Avalos was also arrested for possession of a controlled substance for sale.

Based on all of the above, Officer Jolliff believed he had sufficient facts to support probable cause to search Avalos's residence at 1732 North Virginia Drive for the presence of methamphetamine.

*Contents of Affidavit Submitted in Support of Search Warrant of Plaintiffs' Home*

The affidavit Officer Jolliff submitted in support of the search warrant states that the investigation began in November, 2004, "after multiple sources informed officers of the Colton Police narcotic unit that [Avalos] was a source of supply for methamphetamine in the City." The affidavit then relates the information given by CI#1 in November, 2004, "in reference to on going methamphetamine trafficking by [Avalos] at the Four Seasons apartment complex," namely that "the last two months [meaning September and October, 2004] the CI#1 has purchased an eighth to a quarter ounce of methamphetamine from [Avalos] on at least fifteen occasions." Further the affidavit noted that "CI#1 calls [Avalos] on his cell phone to arrange the purchase. After the call and a short time later [Avalos] drives to the Four Seasons and makes the delivery." The DEA's unsuccessful effort to investigate Avalos was confined to a single sentence in the affidavit, and even then, the DEA was not identified: "Officers from the Colton Police Department and an allied agency attempted to conduct a surveillance of [Avalos, but he] conducted extensive counter surveillance and officers were unable to follow." Then the affidavit proceeded to relate the more recent information given by the last two confidential informants.

Insofar as the second confidential informant, the affidavit noted: "Within the last 45 days Officer Campa and I interviewed . . . CI#2[,] who states that he/she has been given to sell or

purchased up to two ounces of methamphetamine from [Avalos] on at least three occasions. CI#2 states that [Avalos] is the manager of the apartment complex . . . called the Four Seasons and lives on Virginia Drive. CI#2 states that he contacts [Avalos] by phone and [Avalos] responds from his residence to meet him at the Four Seasons. CI#2 states that [Avalos] is criminally sophisticated and uses counter surveillance when the delivery is made [by calling] other members of his organization at the Four Seasons [to] look out for the police [and] when . . . told the location is clear [then] he drives in and makes his delivery." The affidavit also relates CI#2's observation to the police officer that Avalos "is a major source of supply for the east portion of the City and supplies renters at the Four Seasons to sell methamphetamine for him."

The affidavit then recites the information supplied to Officer Jolliff by CI#3 just "10 days" prior to the warrant's application. Specifically, the affidavit recites CI#3 informing an officer that the informant "had recently purchase a usable amount of methamphetamine from [Avalos] . . . in excess [of] twenty times from [Avalos's] residence located at 1732 N. Virginia Drive in the City of Colton." The affidavit then notes CI#3's relaying to the officers that "he/she has been present when [Avalos] has sold methamphetamine to other buyers and conducts the sales in the garage of the house." It is then noted that CI#3 took Sgt. Glass and Officer Campa "to point out and verify [Avalos's] residence," and that CI#3 "directed [the] officers to the 1700 block of Virginia Drive and pointed out the house at 1732 as [Avalos's] residence."

The affidavit concludes by reciting that a check of the DMV database indicates that Avalos's address as of October, 2004, was listed at 1732 Virginia Drive, Colton, California, and by providing Avalos's arrest record from the 1980s and 1990s.

Based on this, Officer Jolliff attested to his "belief that the residence located at 1732 N. Virginia Drive in the City of Colton . . . is being used by [Avalos] for the storage and sales of methamphetamine."

Notably, the affidavit failed to include any of the information regarding Avalos's employment as a confidential informant in the service of the DEA or the 2003 arrest Avalos had suffered for sale of a controlled substance.

At 6:00 a.m. Officer Jolliff contacted the on-call magistrate judge, drove over to the judge's home, and presented the warrant. After reading the warrant in Officer Jolliff's presence, the magistrate judge signed it, and the warrant was executed promptly thereafter at 7:00 a.m. on the same day. During the later search of the house methamphetamine was supposedly found (it is alleged that one of the officers, Morehouse (see footnote one below), actually planted baggies containing methamphetamine in Avalos's toilet during the search) and Avalos was charged with various narcotics-related criminal offenses.[2]

---

[2] Avalos also asserts that certain other constitutional violations occurred in the conduct of the search by Colton police officers, namely one Officer Morehouse, above and beyond that allegedly caused by the purported probable cause defects (and/or Franks violation) with the

At the state court criminal trial that followed, a motion was filed to suppress the evidence seized during the search on account of defects in the warrant, namely, the lack of probable cause appearing therein to justify such a search.  The state court judge denied the motion to suppress at the conclusion of the hearing, commenting:

> My recollection of the law is that the informant either has to be reliable or he has to be corroborated.  There is no allegation [in the affidavit submitted in support of the warrant application] that [the confidential informant] was reliable.  My understanding of the law is that two [informants] — I don't want to say unreliable, but not shown to be reliable informants can corroborate each other.
>
> I have an allegation of three informants in this case.  In addition to that there's an allegation by at least two of the informants that the defendant lives on Virginia Drive.  That was corroborated by the officers in this case.  They went by Virginia Drive and checked with the DMV, and the officer also found further corroboration of the fact of the defendant's previous criminal record.
>
> I find there is sufficient probable cause.  I'm going to deny the motion to quash.[3]

Because the crime being tried was a felony, Avalos did not have a right to immediately appeal the denial of his suppression motion.  Instead, he filed a petition for an extraordinary writ of mandate from the state appellate court, which was summarily denied without comment.

At trial, Avalos's counsel offered to the jury the factual defense that the Colton police officers planted the drugs they allegedly recovered from Avalos's toilet.  At the conclusion of the trial, the jury acquitted Avalos on all counts.

Avalos then filed the instant section 1983 civil rights complaint against the City (alleging

---

warrant and the affidavit submitted in support of it.  Specifically, the second amended complaint alleges that Officer Morehouse "engaged in various unreasonable and unlawful acts, including but not limited to, breaking down plaintiff's front door, striking Avalos with a pistol in his face shattering two front teeth and cutting the inside of his lower lip, pointing a gun at [Avalos's] 7-year old [son] terrifying him, slamming [Avalos's wife] head on the carpeted floor several times causing neck, spine and lower back injuries."  (Second Am. Compl. ¶ 14).

[3]  The parties' spar over whether the state court's ruling on the motion to suppress has preclusive effect on plaintiffs being able to argue about the adequacy of the warrant in this case.  Given that the Court resolves the issue on the merits of whether probable cause in fact existed, it will not address this procedural issue.

MINUTES FORM 90                                                              Initials of Deputy Clerk __cls_____
CIVIL -- GEN                                            6

Monell-type claims), as well as against, among others, Officer Jolliff for, among other things, "entering [his] home without probable cause." (Second Am. Compl. ¶ 24a).

## II. ANALYSIS

The entire focus of the present motion for summary judgment brought by defendants — the City, officer Jolliff, and another officer, one Shawn McFarland — is confined solely to the sub-claim that plaintiffs' constitutional rights were violated because the warrant (and the affidavit submitted in connection therewith) was not supported by probable cause that there would be drugs found at their home.

Avalos admits to being a former drug trafficker, with multiple narcotics-related arrests and convictions between 1978 and 1994. He subsequently cooperated with the government as a contract informant for a DEA task force. Avalos also manages a Colton apartment complex called, "The Four Seasons." He lives with his wife and three children in a single family home located on Virginia Drive also in Colton.

There are two things contained in Officer Jolliff's affidavit that can be argued to support a finding that probable cause existed that evidence of a narcotics crime would be found at plaintiffs' residence: The information relayed by the three confidential informants, and Avalos' prior arrests and convictions for narcotics-related crimes.

Plaintiffs attempt to undermine the weight to afford this set of factual statements. First, they seize onto the fact that nowhere in the affidavit submitted by Officer Jolliff did he once vouch for the reliability of the three informants. (Opp. at 8 ("There is not a word anywhere in the warrant affidavit tending to show that CI#1, CI#2, or CI#3 was trustworthy in any respect. There is no indication that any of them ever provided accurate information in the past")).

From there plaintiffs make the observation that, generally, information provided by a single confidential informant, for which there is no showing made as to the source's trustworthiness, is insufficient to establish probable cause. See United States v. Stanert, 762 F.2d 775, 779 (9th Cir. 1985) ("credit a confidential source's information in making a probable cause determination, the affidavit should support an inference that the source was trustworthy"). Of course, the existence of probable cause is not done on a piecemeal approach. What standing alone may not provide a showing of probable cause to search the place in question may, when considered in light of everything else presented, contribute to an overall showing of probable cause. That is the core holding of the United States Supreme Court's decision in Illinois v. Gates, 462 U.S. 213, 238 (1983) (finding that a "totality of the circumstances" test applies to ascertaining probable cause to search"). That principle is central to evaluating the affidavit in question here.

Plaintiffs understandable seek to cabin off the information provided by CI#3 from the other two confidential informants on the grounds that nothing in information relayed by the first two informants tended to support a showing that narcotics-related evidence would be found at plaintiffs' home, as opposed to the Four Seasons apartment. This is significant because the law proivdes

that when "the reliability of several . . . confidential sources" is not established, "the detailed nature of many of their statements and the interlocking nature of their stories" may, when looked at together, support a finding of probable cause.  United States v. Hernandez-Escarsega, 886 F.2d 1560, 1566 (9th Cir. 1989) (citing United States v. Landis, 726 F.2d 540, 543 (9th Cir. 1984) ("interlocking tips from different confidential informants enhance the credibility of each")).  Thus, the question arises whether the three confidential informants information "interlock" insofar as designating plaintiffs' residence as a local for criminal activity/evidence.  On this point, the Court finds that defendants proffer the most cogent explanation for how the informants tips did in fact interlock with one another:

> All three informants told Colton officers that Avalos was selling methamphetamine; not marijuana, not cocaine and not heroin.  CI#1 said he/she purchased methamphetamine at least 15 times in the preceding 60 days, and that after calling Avalos, Avalos would drive to the Four Seasons to sell the drugs.  CI#2 said he/she either had purchased, or been given to sell, methamphetamine on 3 occasions, that Avalos lived on Virginia Drive and, after calling him, Avalos would respond from his residence to the Four Seasons [to sell the methamphetamine].

(Reply at 5 (emphasis in original)).  It must be remembered that the search warrant was not simply for evidence of the sale of drugs occurring at the home, but also for the "storage" of those drugs at the home.  CI#2's information that, after calling Avalos at home to purchase those drugs, Avalos would drive over to the Four Seasons from his home on Virginia Drive to deliver the drugs creates a strong inference that the drugs themselves were kept stored at the home.  In this respect, CI#2's information "interlocked" with that of CI#3 on the home being a locale for at least the storage of methamphetamine, and thus corroborated CI#3's tip in that regard.  Although weaker in terms of its "interlocking" nature on this point, the information in CI#1's tip that Avalos would "drive" from somewhere to the apartments to make the sale/delivery also implies that the drugs themselves were stored elsewhere off-site from the Four Seasons' apartment complex itself.  In this respect, the present case is not (despite plaintiffs' arguments to the contrary) all that different from that in United States v. Nielsen, where the credibility of three untested informants was found to be "buttressed by the similarity of their accounts: All three stated [defendant] possessed large quantities of methamphetamine" and two "stated that they had purchased methamphetamine from [defendant], and that [defendant] had retrieved it from the basement of his house."  371 F.3d 574, 580 (9th Cir. 2004).

      Add to this mix is the fact that one of the people living at this home (noted by the informants and corroborated by the DMV license check) had a string of arrests and convictions for drug-related offenses stretching from the 1970s to 1994.  "[T]he use of prior arrests and convictions can be helpful in establishing probable cause, especially where the previous arrest or conviction involves a crime of the same general nature as the one the warrant is seeking to uncover."  Greenstreet v. County of San Bernardino, 41 F.3d 1306, 1309 (9th Cir. 1994).

Plaintiffs attacks on the trustworthiness of the confidential informants on the grounds that perhaps the information they relayed was to secure a better deal with authorities after having been picked up on other offenses is not well taken.  See United States v. Bishop, 264 F.3d 919, 925-26 (9th Cir. 2001) (holding that even where an informant has a spiteful motive for informing on suspect, "it would have to be a very naive magistrate who would suppose that a confidential informant would drop in off the street with such detailed evidence and not have an ulterior motive").[4]

Plaintiffs' final argument is that the warrant is defective for a Franks violation because Officer Jolliff failed to include in the affidavit information indicating that Avalos had been working as a contracted informant for the DEA for at least until the late 1990s and perhaps into the early to mid 2000s.

A warrant can certainly be invalidated where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth."  Leon, 468 U.S. at 923.  By reporting less than the whole story, an affiant can "manipulate the inferences a magistrate will draw" and "mislead in a manner that could denude the probable cause requirement of all real meaning."  United States v. Stanert, 762 F.2d 775, 781 (9th Cir. 1985).  To make out such a claim, however, it must be shown that (1) the omission was deliberate (a point which defendants concede, owing to Officer Jolliff's interaction with Avalos as an informant while working on the DEA task force) and (2) that, but for the omission, the warrant would not have issued.  See Liston v. County of Riverside, 120 F.3d 965 (9th Cir. 1997).

However, what is striking about plaintiffs' argument in this regard is the selective nature of the information they contend Officer Jolliff omitted, and thus, should have been included in the affidavit.  They simply object, and confine their argument, to the failure to note that portion of Avalos' history where he actually served as a paid informant for the DEA to the magistrate judge.  But if that information must have been included (although not precisely explained, the Court gathers that the inference from this information is that any otherwise perceived "criminal activity" on Avalos part could have been explained away as being done pursuant to the orders of his DEA handler(s)), so too must have been the other most recent aspect of that information relaying to Avalos' informant status: Namely, by the end of 2004, the DEA (the agency that was supposedly handling him as an informant) had begun an narcotics-related investigation with Avalos as the avowed target of that investigation.  See United States v. Stanert, 762 F.2d 775, 782 (9th Cir. 1985) (noting that whether an affidavit supports a finding of probable cause is traced to whether,

---

[4] Plaintiffs also argue that Officer Jolliff could have done a lot more to establish probable cause than what he did in this case (use of a "controlled buy" at plaintiffs' home, basic surveillance at the home, examination of baggies for prints, placement of a wire on one or more of the confidential informants, etc.,).  (Opp. at 9).  But once probable cause has been established it need not be capped off with a figurative "cherry" to render what has otherwise been established complete.

"once corrected and supplemented, [the omitted information, considered in full] would provide a magistrate with a substantial basis for concluding that probable cause existed"). Once the complete set of information related to Avalos' informant past is taken and presented together, it is hard to see how this information's omission was "material." Actually, if anything, the omitted information would tend to show that Avalos had fallen off the wagon, so to speak, and was back to his criminal, drug-dealing ways. Indeed, his level of criminal activity had become so intensified after leaving the "employ" of his DEA handlers that they decided to commence a narcotics investigation with him as their target. Nowhere do plaintiffs acknowledge, much less take into account, this latter history of Avalos' interaction with the DEA as an informant. Instead they simply seek to have the "he worked as an informant" portion of the story told to the magistrate judge in the hopes that this somehow "cleansed" or otherwise "explained away" any of the other direct and circumstantial evidence that tended to show him engaging in criminal activity. That simply is not how the process of determining the materiality of an omitted piece of information works — one must take the good with the bad. The same is true here.

      Moreover, if the Court were going to bring in the whole "omitted story," Officer Jolliff also forgot to mention to the magistrate judge that Avalos had been arrested for a drug-related offense in 2003, only a year before the evidence relayed in the affidavit that was submitted to support a showing of probable cause.

      In the end, the Court finds that probable cause was established in the information relayed in the affidavit to search plaintiffs' home, and that nothing that was omitted from that affidavit would be considered "material" once all the omitted information were included.

      Accordingly, the Court awards summary judgment to defendants on the subclaim in the complaint related to whether probable cause existed for the warrant to search plaintiffs' home.

      **IT IS SO ORDERED.**